**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARILYN J. BLACK,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. C2-07-CV-194** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **HOLZER CLINIC, INC.,** | : | |
| | : | **Magistrate Judge Abel** |
| **Defendant.** | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment. Plaintiff Marilyn J. Black ("Black") filed suit against the Defendant Holzer Clinic, Inc. ("Holzer Clinic"), alleging that Holzer Clinic violated the Family and Medical Leave Act ("FMLA") by: (1) penalizing her for absences that were FMLA-protected; (2) using an FMLA-protected absence as a negative factor that led, at least in part, to her discharge; and (3) refusing to restore her to employment on May 15, 2006. Additionally, Plaintiff alleges that Defendant discharged her in violation of Ohio Public Policy.

For the reasons set forth below, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## II. BACKGROUND

### A. Factual History

Black began working at Holzer Clinic's Urgent Care Clinic ("UCC") in Gallipolis, Ohio on December 5, 2000. She was employed as a Licensed Practical Nurse at the UCC until she was

terminated on April 7, 2006.

## a. Verbal Counseling and Performance Reviews

During the last three years of Black's employment with Holzer Clinic, Black was supervised by Matthew Mossburg ("Mossburg"), the Clinical Manager of the UCC. Mossburg alleges that he verbally counseled Black on numerous occasions about issues related to her attitude, most notably her interactions with co-workers and patients. Until February 2006, Plaintiff was never formally written up or formally disciplined for these issues relating to her attitude. Plaintiff disputes that she was ever informally counseled about her attitude.

In Mossburg's performance evaluations of Black for the years 2003, 2004, and 2005, which Black signed as having read, Mossburg noted that in general, Black "met" or "exceeded" all of Holzer Clinic's objective standards for employment. This included "No. 5 Attitude," under which Mossburg noted that Black "meets standards," for each year's evaluation. However, Mossburg also noted many specific problems on Black's performance evaluations:

-She needs to "constructively verbalize complaints with restraint and to the correct person" (2003 Review) and she needs to "refrain form doing so in front of patients" (2004 Review, 2005 Review).

-She "needs to participate more in a team setting" (2003 Review) and she "needs to promote the UCC better in front of patients" (2004 Review, 2005 Review).

-She "shows steady progress" in her attitude toward the UCC, but she "needs to show same progress when dealing with others - (hospital employees) (disruptive patients)" (2004 Review, 2005 Review).

-She "needs to spend some time thinking about what teamwork is and how it effects others. [She] spends too much time worrying about what everyone else is doing and not enough worrying about what she can do to fix a problem" (2005 Review).

-She "gets too wrapped up with what others are doing, instead of keeping busy doing her own job" (2005 Review).

-She "needs to learn how to distinguish the difference between personal problems and actual UCC problems" (2005 Review).

-She "needs to learn how to use tact when dealing with other employees" (2005 Review).

### b. February 2, 2006 Incident

On February 2, 2006, a patient called Mossburg and asked him if she could bring her child into the UCC for an allergy injection. The patient informed Mossburg that she had the vials of medication and required documentation with her and could bring them to the clinic. Mossburg told her that she could bring her child in for an injection. Following this conversation, Mossburg called the Registered Nurse in the UCC, Joyce Polcyn ("Polcyn"), and asked that she take care of the patient.

When the patient came into the UCC, the patient provided Polcyn with the vials of medication. The labels on the vials of medication had the prescription and all information necessary for Polcyn to administer the allergy injection. As Polcyn prepared to give the patient's child the allergy injection, Black told Polcyn that she should not give the injection and that Mossburg did not know what he was doing. Additionally, Black told Polcyn that she was upset that the patient came to the UCC for the allergy injection. Polcyn alleges that Black said these things very loudly in front of the patient. Black asserts that though she said these things, none of this was said in front of the patient. Black also denies that she was ever loud or abusive in front of the patient.

Another nurse, Sharon Banks ("Banks"), who was present at the time, also alleges that Black made very loud and inappropriate statements in front of the patient about the allergy injection and said that they should not be doing these injections in the UCC. According to Polcyn, the patient informed Polcyn that she was upset by Black's behavior. According to

Mossburg, the patient also called him and complained about Black's behavior. Black responds that these other witnesses are wrong, as this conversation did not take place in front of the patient.

Black admits she did not know the specifics of the conversation that Mossburg had with Polcyn about this particular injection. Black does not dispute that she was not the nurse assigned to care for the patient, that she was not asked to give the allergy injection, and that she had not seen the vials of medication that the patient brought with her. In addition, Black does not dispute that Polcyn ultimately did have the necessary information to administer the injection and that she was in compliance with all medical regulations in administering the injection.

Polcyn testified in her deposition that she brought this incident to Mossburg's attention because she believed Black's behavior and attitude were inappropriate, especially in light of the fact that this incident took place in front of the patient. When the incident was brought to Mossburg's attention, he spoke with the patient, Polcyn, and Banks. According to Mossburg, all three of these individuals said Black caused the scene in front of the patient. According to Mossburg's investigation report made on February 13, 2006, the patient was embarrassed for the other nursing staff because Black "created such a fuss."

According to Holzer Clinic documentation, on February 6, 2006, Mossburg wrote up an "Employee Warning and Termination Form" for Black due to "improper conduct" and "attitude." The "Remarks" state that Black "caused a scene in front of a patient that was in the UCC to have an allergy injection." And the "Action to be Taken" states that Black "will apologize to the family and to the staff member that she confronted. Any further infraction of this kind will result in immediate termination." According to the document, Mossburg and Sarah

Waddell ("Waddell"), another Clinical Manager at Holzer Clinic, signed it on February 6th.

On that same date, according to Holzer Clinic documentation, Mossburg wrote up and signed a memo detailing his alleged conversation with Black. He states that she made verbally inappropriate comments to the staff regarding the allergy patient, so he gave her a warning about her attitude and improper conduct in front of the patient. He wrote, "Consistently I have problems with [Black] and her attitude. I receive many complaints about [Black] and how she is negative toward the other staff and how she is disrespectful. I have spoken to [Black] on a one on one basis many times." He wrote that his discussion with Black on that date consisted of:

-Inappropriate comments made to patients and staff

-Inappropriate "pot stirring" of staff and physicians pitting people against each other and making inappropriate comments about the other staff members and their skills

-Attitude – [Black] has a bad attitude about staff, her work in general and physicians

-Inappropriate behavior and comments in front of patients – creating scenes in front of patients and in public areas.

He also wrote that he warned her she had 30 days to improve her attitude or she would be terminated from the UCC. He described some of the issues she must improve upon:

-Being respectful to staff, both new and old

-Not using inappropriate (foul) language in front of patients

-Helping to develop the new staff in a friendly manner

-Not stirring the pot between staff and physicians

-Not creating scenes in front of patients.

Waddell was a witness to this alleged conversation. Waddell wrote up her own summary of the conversation. She wrote that the following things were discussed: "Bad attitude,

disrespectfulness, lack of teamwork, need to appropriately help patients, and using profanity." She wrote that there had been "multiple complaints with the above mentioned items." And that Black's "attitude toward her co-workers and physicians . . . is inappropriate and unprofessional." Waddell stated that these issues "were discussed in great length and were to be resolved in 30 days, or termination would ensue. [Black] expressed understanding, and agreement."

Black asserts that contrary to the provided and signed documentation and testimony of Mossburg and Waddell, Mossburg did not speak with her until February 22, 2006. She asserts that he merely told her what had happened with the patient and that he was writing her up for a 30-day probation. Black admitted to Sandy Queen ("Queen"), Medical Secretary to the UCC, that she was placed on a 30-day probation. Black also asserts that about two weeks later, Mossburg said he was not going to write her up.

### c. April 7, 2006 Termination

On March 31, 2006, Black went to Mossburg's office looking for the April staffing schedule. According to Mossburg, once Black saw the schedule, she said, "I am not working this weekend, you wait and see, I will quit." Tom Denbow, another employee, was also present for this conversation. According to Denbow, Black warned Mossburg, "I better not be working any weekends." And when Mossburg said that she had to take turns on weekends because it is part of her job, she said "no I'm not" and threatened to quit. Denbow also alleges he heard her take the schedule and say, "wait and see what happens." According to Black, all she said was that she did not have a way to get there on the weekend, so she told Mossburg, "I will have to see about getting some way to get here for the different hours." Polcyn also stated in her affidavit that she heard Black criticizing Mossburg to some staff about the work schedule on April 2, 2006. Black

does not dispute that this occurred.

On April 3, 2006, Mossburg alleges that he made the decision to terminate Black's employment due to attitude problems. However, that day was Black's day off. Black then called off work on April 4th and April 5th. She did not inform anyone at Holzer Clinic why she called off works those days. Black admits that Mossburg tried calling her on the 4th and 5th to come in for a meeting and left messages for her.

According to the Holzer Clinic documentation, on April 5th, Sandy Queen ("Queen"), Medical Secretary to the UCC, wrote and signed a paper stating that on several occasions, Black would come to her office complaining about problems she had with the schedule, Mossburg, and other subjects. Queen warned her to be careful and that she would be fired if she did not improve her behavior. Queen alleged that Black "would not listen to anyone that warned her not to be out of line." And, she alleged that Black was not helpful in training the new nursing staff and was rude to them. For instance, she would complain about things the new nurses did wrong, but did nothing to help them learn the correct way.[1]

Black finally called Mossburg back on the 6th, which was a day Black had off, and he told her he had a meeting set up for the 7th to discuss Black's future with the Holzer Clinic. When Black came in on the 7th, Waddell was also present. According to Black, Mossburg "just walked in the door and put his hands on his hips and said, 'We're parting the ways. It's time that you and I part the ways.'" He then informed her it was "due to non-employee cooperation."

According to the Holzer Clinic documentation, on April 6th, Mossburg wrote up an "Employee Warning and Termination Form" for Black due to "improper conduct," "attitude,"

---

[1] These problems with Black were also reiterated in Queen's affidavit.

and "insubordination." The "Remarks" state that Black "has been warned many times to stop causing trouble and talking about other staff and pitting people against each other." And the "Action to be Taken" states "Termination of employment from [Holzer Clinic]." According to the document, Mossburg and Waddell both signed it on April 7, 2006. There is also a notation made on that date where the employee's signature is supposed to be that states, "Refused to Sign." Black asserts she never saw this termination form.

According to the Holzer Clinic documentation, on April 6th, Mossburg also wrote up a summary of the reasons he was terminating Black. Specifically he wrote:

> Insubordination: On Friday, March 31, 2006, [Black] came to my office looking for the April staffing schedule. She asked for a copy and I handed one to her and as she looked at it she said, "I am not working weekends, you wait and see, I will quit." I told her to not let the door hit her on the but on the way out. She did this in front of Tom Denbow while we were talking about a project.

> Improper Conduct: On Sunday, April 2, 2006, one of my staff members overheard [Black] talking to one of the Pediatric Physicians trying to "stir the pot" about the new staff. [Black] was complaining that the new staff did not know what they were doing and should not be working in the UCC. As my staff member walked around the corner and overheard this, [Black] quickly stopped talking and went back to work. Dr. Kottapalli mentioned to me that [Black] is always pitting him against me and trying to get him to side with her against me.

> Attitude: I have had many discussions about [Black's] attitude over the last few months. It has been slowly declining and would perk up after I would discuss a problem with her. She does well for a week or so and then slips backwards and reverts back to her old ways of doing things. For example, [Black] will treat new staff very poorly by not showing them the ropes and directing how things are properly done in the [UCC]. She talks down to them and makes improper comments about them to the physicians and staff in other departments.

Mossburg wrote that Black is not good at dealing with people, has no tact, and cannot keep control of her mouth. He also wrote that she is rude to others and goes out of her way to cause conflict. He concluded, "For this reason, I see no other solution than termination."

Black alleges that she brought medical documentation to the April 7th termination meeting. She claims that she tried to give the documentation to Mossburg after her termination, but he refused to take it. Black does not allege that Mossburg actually saw or read the documentation. The first document stated that Black had visited to the doctor's office and should be excused from work for April 4th and 5th, but did not state why. The second document, issued April 7th, stated that Black was unable to work "at this time" and "will be rechecked in two weeks." This also did not state why she was unable to work. Black asserts that it was due to anxiety and stress. Black never provided medical documentation to the human resources department or anyone else at the Holzer Clinic.

While Mossburg does not recall receiving any medication documentation from Plaintiff on April 7th, he asserts that the decision to terminate Black had been made on April 3rd – four days prior to the April 7th meeting. Furthermore, according to Black's own testimony, she was terminated immediately by Mossburg as soon as she saw him, and before she was able to request leave.

## B. Procedural History

On March 7, 2007, Plaintiff filed suit against Defendant, alleging that her termination violated the FMLA and Ohio Public Policy. Defendant moved for summary judgment on March 31, 2008.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a

verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rest upon its mere allegations." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

### IV. LAW AND ANALYSIS

Plaintiff alleges that Defendant violated the FMLA by: (1) penalizing her for absences that were FMLA-protected; (2) using an FMLA-protected absence as a negative factor that led, at least in part, to her discharge; and (3) refusing to restore her to employment on May 15, 2006. Additionally, Plaintiff alleges that Defendant discharged her in violation of Ohio Public Policy.

Plaintiff and Defendant disagree as to many facts surrounding Plaintiff's claims. Defendant has produced affidavits and depositions of numerous witnesses and several signed and dated documents that dispute Plaintiff's version of the facts. Nevertheless, this Court must not resolve credibility issues against the nonmovant, and "any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Ctr. for Bio-Ethical*

*Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007).[2]

## A. FMLA Claim

The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave

each year if, among other things, an employee has "a serious health condition that makes the

employee unable to perform the functions of the position of such employee." 29 U.S.C. §

2612(a)(1)(D). Pursuant to the FMLA, "[i]t shall be unlawful for any employer to interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided under [the

FMLA]." 29 U.S.C. § 2615(a)(1). The Sixth Circuit recognizes "two distinct theories of recovery

under the FMLA: (1) the 'entitlement or interference' theory arising under 29 U.S.C. §

2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising under 29 U.S.C. §

2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir. 2004).

Entitlement/interference claims are based on prescriptive rights, which establish entitlements to

employees and set floors for employer conduct, while retaliation claims are based on proscriptive

rights, which prohibit disparate employer conduct with regard to employees taking leave. *Taylor*

*v. The Union Inst.*, 30 F. App'x 443, 452 (6th Cir. 2002).

Plaintiff's Complaint does not specifically state whether she is alleging that Defendant

interfered with her rights under the FMLA or that Defendant retaliated against her for taking

FMLA-protected leave. Plaintiff alleges that Defendant violated the FMLA by: (1) penalizing

Plaintiff for absences that were FMLA-protected; (2) using an FMLA-protected absence as a

---

[2]However, when opposing parties tell two different stories, one of which is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007); *Carter v. City of Wyoming,* No. 07-2296, 2008 WL 4425986, at *2 (6th Cir. Oct 1, 2008). This Court finds that Plaintiff's version of the facts is pushing the limits of what this Court can accept as true.

negative factor that led, at least in part, to Plaintiff's discharge; and (3) refusing to restore Plaintiff to employment on May 15, 2006. These allegations could lend themselves to either an interference or retaliation claim. Therefore, this Court will analyze both.

### a. FMLA Interference

In order for Plaintiff to establish that Defendant interfered with her rights under the FMLA, Plaintiff must show the following: (1) the Plaintiff is an FMLA "eligible employee;" (2) the Defendant is an FMLA employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Calvin v. Honda of Am. Mfg.*, Inc., 346 F.3d 713, 719 (6th Cir. 2003).

First, at the time Plaintiff took the April 4th and 5th leave, Plaintiff was an "eligible employee" as defined in 29 U.S.C. § 2611(2) because she worked over 1250 hours the prior twelve months before commencement of leave on April 4, 2006.[3] Second, Defendant was an "employer" as defined in 29 U.S.C. § 2611(4) because it employed over fifty employees. Third, Plaintiff was entitled to take leave beginning on April 4, 2004 for a "serious health condition" as defined in 29 U.S.C. §2611(11) because she suffered from anxiety and stress that involved

---

[3]Defendant asserts that Plaintiff was not an eligible employee because the decision to terminate Plaintiff was made on April 3, 2006, her day off, and before she took the 4th or 5th off due to medical reasons. The evidence shows that Mossburg tried to contact Plaintiff on the 4th and 5th to set up a meeting. Plaintiff finally called Mossburg back on the 6th, which was another day Plaintiff had off, and they set up a meeting for the 7th. Plaintiff has put forth no evidence to dispute that the decision to terminate her employment was made on April 3rd. Defendant thereby asserts that pursuant to *Penson v. Autozone Stores, Inc.*, No. 1:06CV140, 2006 WL 3097213 (N.D. Ohio Oct. 30, 2006) if an employer's "*decision to terminate* Plaintiff occurred before he requested leave . . . he was not an eligible employee under the FMLA, and not entitled to benefits thereunder." *Id.* at *2 (emphasis added). However, the Sixth Circuit has not yet acknowledged that the "decision to terminate" an employee can make an employee ineligible for FMLA leave, as opposed to the "actual termination." *See, e.g., Brohm v. JH Props., Inc.,* 149 F.3d 517, 523 (6th Cir. 1998) (a plaintiff must present evidence that she was still employed at the time she requested leave). Therefore, this Court finds this argument unavailing.

continuing treatment by a health care provider.

However, there is an issue with the fourth element, which requires the employee give the employer notice of her intention to take leave. "[N]othing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee. Rather, to invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm*, 149 F.3d at 523. Regarding this notice requirement, a plaintiff must present evidence that she was still employed at the time she requested leave. *See id.* In *Green v. Burton Rubber Processing, Inc*., the employee claimed that he intended to request four days of leave, but he was terminated before he was able to request the leave. 30 F. App'x 466, 468-69 (6th Cir. 2002). The *Green* court held that once the employee was discharged, "he was no longer an employee, and he was thus not entitled to leave under the FMLA." *Id.* at 471.

Accepting Plaintiff's assertion that she took medical documentation to the April 7th meeting and tried to give it to Mossburg after she was terminated, but he refused to take it, this does not satisfy the notice requirement. Plaintiff herself testified that she was terminated immediately by Mossburg as soon as she saw him, and before she was able to request leave. She testified, "He just walked in the door and put his hands on his hips and said, 'We're parting the ways. It's time that you and I part the ways.'" The record does not show that Mossburg knew of, saw, or read the medical documentation prior to terminating Plaintiff.[4]

In addition, Plaintiff makes no assertion that she informed anyone at Holzer Clinic in the days prior to her termination that her absences on April 4th and 5th were due to a medical condition or that she would need further leave for a medical condition. She merely states, "I

_____

[4]The record also shows that Black never provided this medical documentation to the human resources department or anyone else at the Holzer Clinic.

called off Tuesday (April 4th) and Wednesday (April 5th)."[5] This is insufficient to alert anyone at Holzer Clinic that Plaintiff was missing work for a qualifying reason. The record establishes that Plaintiff did not provide notice and a qualifying reason for requesting leave prior to her termination. Therefore, Plaintiff has not established a prima facie case.

Even if Plaintiff could establish a prima facie case of FMLA interference, the burden would then shift to Defendant to establish a legitimate non-discriminatory reason for the discharge. *Taylor*, 30 F. App'x at 448. The defendant bears only the burden of production, not the burden of persuasion, so the defendant must merely "articulate a valid rationale" for the adverse employment action. *Id.* Mossburg stated, "The reason for the firing was attitude and the problems that stemmed with the attitude. That was the reason I terminated her. . . . No other reason." Therefore, Defendant has asserted a legitimate reason for terminating Black.

The burden then shifts back to Plaintiff to establish, by a preponderance of the evidence, that the Defendant's proffered reason was not the actual reason for the discharge. *Id.* In other words, Plaintiff must show Defendant's proffered reason was a mere "pretext for intentional discrimination." *Id.* She can do this by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate Defendant's decision; or (3) was insufficient in light of the particular adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 545 (6th Cir. 2003).

First, Plaintiff cannot establish that this reason has no basis in fact. Construing the evidence in the light most favorable to Plaintiff, this Court must accept her assertion that she was

---

[5]Plaintiff's counsel asserted at the oral argument on Defendant's Motion for Summary Judgment that Plaintiff had called in sick on April 4th and 5th. However, there is no evidence in the record that shows Plaintiff called in sick. Rather, the record establishes she just called off work that day, which could have been for a multitude of reasons. In fact, Plaintiff asserts that she could "miss work at Holzer Clinic for up to three days without providing any sort of excuse."

never informally counseled about attitude issues. However, the evidence shows that there were many specific problems with Plaintiff's attitude, particularly relating to coworkers and patients, written in her performance evaluations in 2003, 2004, and 2005. Plaintiff signed these evaluations, indicating that she read them. Therefore, the record establishes that there was an undisputed documented history of attitude problems with Plaintiff and that Plaintiff was aware of this history of problems.

In addition, affidavits and depositions of Mossburg, Waddell, Polcyn, and Queen show that Plaintiff had a history of attitude problems. Plaintiff has put forth no evidence to support that she did not have such problems, other than to assert she was never formally written up or disciplined and that she received "good performance evaluations," which is belied by the evidence in the record.

Furthermore, the February 2, 2006 injection incident provides evidence of a specific attitude problem that Mossburg perceived. Plaintiff asserts that though she told Polcyn she should not give the injection to the patient, this statement was not made in front of the patient. Regardless of whether the patient heard Plaintiff's statement, Polcyn and Banks reported to Mossburg that Plaintiff made this statement in front of the patient. In addition, Mossburg states that he spoke with the patient and she confirmed that the incident occurred. Therefore, even accepting Plaintiff's assertion that this statement was not made in front of the patient, it was reasonable for Mossburg to believe that this incident occurred. And even accepting Plaintiff's assertion that Mossburg did not speak with Plaintiff until February 22nd about the incident, in spite of the signed documents provided by Mossburg and Waddell,[6] the evidence shows that

---

[6]Plaintiff does not specifically state that these documents were manufactured after the fact, but she seems to imply such.

Mossburg told Plaintiff that he was writing her up for a 30-day probation.

Finally, Plaintiff was overheard criticizing Mossburg about the work schedule to some of the staff on April 2nd. In addition, Plaintiff complained to Queen about Mossburg. Plaintiff does not dispute these facts. Therefore, for all the foregoing reasons, Plaintiff has not produced evidence that the proffered reason for her termination, attitude problems, has no basis in fact.

Second, Plaintiff has no evidence refuting Mossburg's testimony that it was, in fact, her poor attitude that motivated Defendant's decision to terminate her employment. Plaintiff does not allege that any statements were ever made indicating her discharge had anything to do with any issue other than her attitude problems. In fact, Plaintiff admits that Mossburg told her they were "parting the ways due to non-employee cooperation." The only tie to her exercise of her FMLA rights is the temporal proximity in time between the discharge and her informing Mossburg of her need to take FMLA leave. As stated above, however, the record establishes that she was terminated *prior* to any request or notice of FMLA leave. Furthermore, even if she had provided notice prior to her termination (of which there is no evidence in the record), the only tie to FMLA interference is temporal proximity. "[S]uch temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001).

Third, Plaintiff cannot show that her documented attitude problems were an insufficient reason to terminate her employment. Plaintiff herself admits that if someone had a prolonged history of inappropriate behavior at work then that might be grounds for termination.

In sum, Plaintiff has provided no evidence that she did not in fact have a poor attitude, that her long-standing attitude problems did not actually motivate Defendant's decision to

terminate her employment, or that her poor attitude was insufficient to warrant the termination of her employment. Therefore, due to Plaintiff's inability to establish a prima face case and her further inability to establish pretext, Defendant's Motion for Summary Judgment in regards to this issue is **GRANTED**.

### b. FMLA Retaliation

In order for Plaintiff to establish that Defendant retaliated against Plaintiff in violation of the FMLA, Plaintiff must be able to show that: (1) she availed herself of a protected right under the statute by requesting and receiving FMLA leave from Holzer Clinic; (2) she experienced an adverse employment action; and (3) a causal connection between her exercise of her FMLA rights and the adverse employment action exists. *See Gembus v. Metrohealth Sys.*, No. 07-3542, 2008 WL 3977528, at *3 (6th Cir. Aug. 27, 2008). Once Plaintiff establishes a prima facie case, the same burden shifting analysis applies as described above for an FMLA interference claim. *See id.*

As analyzed above, as Plaintiff did not give notice of or request leave prior to her termination, she did not avail herself of a protected right. After she was terminated, she was no longer able to take FMLA leave.[7] Furthermore, there is no causal connection between her exercise of her FMLA rights and the adverse employment action, as she was terminated prior to

---

[7]Plaintiff also makes the misguided argument that Defendant violated the FMLA when it refused to "restore Plaintiff to employment on May 15, 2006." A "Restoration to Position" claim is based on "failing to restore *an employee* out on FMLA leave back to her position, or an equivalent one, upon her return." *See Bradley v. Mary Rutan Hosp. Assoc.*, 322 F.Supp.2d 926, 937 (S.D. Ohio 2004) (emphasis added); *see* 29 U.S.C. § 2614(a). Plaintiff, however, was terminated on April 7, 2006 and, therefore, was not an employee on May 15, 2006. As such, Plaintiff was not entitled to restoration of her position.

attempting to exercise any FMLA rights.[8]

Furthermore, even if Plaintiff was able to establish a prima facie case, Defendant has presented a legitimate non-discriminatory reason for the termination and Plaintiff cannot show that this reason is pretextual. *See Gembus*, 2008 WL 3977528 at *4. A reason cannot be proved to be pretext for retaliation unless it is shown both that the reason was false, and that retaliation was the real reason. *See Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 521 (6th Cir. 2002). As analyzed above, Plaintiff cannot show that the proffered reason of attitude problems is false or that the real reason was retaliation for exercise of FMLA rights, as the only evidence Plaintiff has presented is temporal proximity. Therefore, due to Plaintiff's inability to establish a prima face case and her further inability to establish pretext, Defendant's Motion for Summary Judgment in regards to this issue is **GRANTED**.

### B. Ohio Public Policy

Plaintiff has alleged that Defendant violated "Ohio public policies against discharging an employee for her insistence upon adherence to proper and legal medical practice." To establish a claim for wrongful discharge in violation of Ohio public policy, Plaintiff must be able to establish that: (1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) dismissing an employee under circumstances like those involved in Plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) Plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) Defendant lacked an

---

[8]If instead Plaintiff had been terminated after she attempted to exercise her FMLA rights, this suspect timing could provide indirect evidence of a causal connection to establish a *prima facie case*. *Skrjanc*, 272 F.3d at 314 (emphasis added). But timing alone is not sufficient to establish pretext. *Id.*

overriding legitimate business justification for the dismissal (the overriding justification element). *See Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529-30 (Ohio 2002). The clarity and jeopardy elements are questions of law, whereas the causation and overriding justification elements are questions of fact. *Id.* at 530.

Plaintiff makes the assertion that she "*will prove* that she can meet the elements of a wrongful discharge claim in violation of public policy, such that a reasonable jury could find in her favor." However, promises to produce evidence at some later time are wholly insufficient to defeat a fully-supported motion for summary judgment. *See Wilcox v. U.S.*, No. 91-2193, 1992 WL 393581, at *3 (6th Cir. Dec. 31, 1992) ("mere allegations and promises of future evidence do not suffice in opposition to a legitimately supported motion for summary judgment; specific facts, demonstrating a genuine issue for trial, must appear"). It is Plaintiff's burden to establish these elements.

Plaintiff fails to set forth any constitutional provision, statutory or administrative regulation, or common law to support the clarity element. Plaintiff relies on the fact that Defendant conceded for purposes of its Motion for Summary Judgment that Plaintiff could establish a clear public policy. Therefore, Plaintiff assumes that this is sufficient. However, this is a question of law, not of fact. So, this Court must be satisfied that there is legal support for a clear public policy "against discharging an employee for insistence upon adherence to proper and legal medical practice."

However, even assuming there is such a policy, the jeopardy element cannot be established as a matter of law. Plaintiff must prove that if this Court does not allow Plaintiff to bring a common law tort claim for wrongful discharge in violation of public policy, the public

policy would be compromised. *See Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36, 41 (Ohio 2007). There has been no evidence presented that Defendant was not adhering to proper and legal medical practice, particularly in regards to the February 2, 2006 allergy injection.

On February 2, 2006, Plaintiff told Polcyn not to give the injection in the manner it was ordered. Plaintiff admits, however, she did not know the specifics of the conversation that Mossburg had with Polcyn about this particular injection. When the patient arrived, she provided Polcyn with the vials of medication, and the labels on the vials had the prescription and all necessary and required information needed for Polcyn to administer the injection, so Polcyn administered it. Plaintiff does not dispute that she was not the nurse assigned to care for the patient, that she was not asked to give the allergy injection, and that she had not seen the vials of medication or prescription that the patient brought with her. In addition, Plaintiff does not dispute that Polcyn  ultimately had the necessary information to administer the injection according to "proper and legal medical practice."

Therefore, even assuming that Plaintiff was terminated specifically because she protested giving this patient an injection, she was not terminated for "insistence upon adherence to proper and legal medical practice," as Polcyn had everything she needed to legally administer the allergy injection. Plaintiff asserts that even though Polcyn in fact could legally administer the injection, this was against "clinic policy." According to Plaintiff, if a patient brought their medicine in for an injection and had an order from a Holzer Clinic physician with them, then Holzer Clinic would give an injection. However, she asserts, if the patient brought in their medicine but had an order from another physician not from Holzer Clinic, then Holzer Clinic would not give the injection pursuant to "clinic policy." Plaintiff has produced no evidence to

establish that there was clinic policy prohibiting administering injections unless the prescription was written by a Holzer Clinic physician, other than asserting her own belief that this was clinic policy.[9] However, even if there was a such a clinic policy, administering an injection pursuant to a prescription written by an outside physician was not an improper or illegal medical practice.

Therefore, even if there is a public policy against discharging an employee for "insistence upon adherence to proper and legal medical practice," Plaintiff's termination in no way jeopardizes this policy. Defendant's Motion for Summary Judgment in regards to this issue is **GRANTED**.

## V. CONCLUSION

For the foregoing reasons, this Court **GRANTS** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: March 10, 2009.**

---

[9]Plaintiff cannot remember who told her this was clinic policy and Plaintiff has not asserted there was any such written clinic policy. According to Mossburg, it was Holzer Clinic's policy to allow persons to get allergy shots that had orders from physicians outside Holzer Clinic.